David George DuBOIS, Petitioner,

v.

Vincent R. MANCUSI, Warden of Attica
State Prison, Attica, New York,
Respondent.

Civ. No. 1970–86.

United States District Court,
W. D. New York.

March 19, 1971.

Charles F. Crimi, Rochester, N. Y., for petitioner.

Louis J. Lefkowitz, Atty. Gen. of N. Y. (Anthony M. Leone, Asst. Atty. Gen., Buffalo, N. Y., of counsel), for respondent.

CURTIN, District Judge.

Petitioner, a state prisoner confined to Attica Correctional Facility, applies to this court for the issuance of a writ of habeas corpus. By order, the transcript of petitioner's plea, sentence, and the record of prior petitions made to the state court were submitted. After examination of these materials, the court assigned Charles F. Crimi to represent the petitioner and held a hearing.

After the hearing, the court ordered and received the record of petitioner's

observation and treatment at Willard State Hospital, Rochester State Hospital, Attica Prison, Elmira Reformatory, and the report of Dr. Robert H. Duncan dated May 24, 1967. By stipulation, these records are admitted into evidence.

Petitioner alleges that his plea to assault, second degree, made on October 4, 1967, was taken in violation of his constitutional rights. On July 7, 1967, the Monroe County grand jury indicted him in a two-count indictment, one count alleging assault in the first degree, and the other assault in the second degree. At the time of his arraignment on July 11, 1967, counsel was assigned to represent him.

The incident that gave rise to this indictment occurred on May 23, 1967. On that day, petitioner had a stormy argument with his girlfriend, a married woman for whom he worked from time to time as a babysitter. He threatened her with a knife because she called the police. Upon their arrival, they found him hiding behind a china cabinet with the knife in his hand. After arrest, he was treated for superficial lacerations which he received when he refused to submit peacefully.

An immediate psychiatric examination held on May 24, 1967 revealed the following:

"Examination showed some disorganization of thought, paranoid ideation and preoccupation. He was delusional and had a fixed idea that he should kill the persons with whom he had recently resided."

Upon the examining doctor's recommendation, on May 24, 1967 the court committed him to Rochester State Hospital for further study. Upon admission, he gave contradictory statements saying that he was going to kill his girlfriend, and then he would laugh and say that he did not mean it. Petitioner told the examiner that for about the past year he had overindulged in alcohol on occasion, and had used heroin and marihuana.

In psychological evaluation, he obtained a score of I.Q. 79, borderline mental defective range of intelligence. This confirmed prior tests made in September, 1966. The examiner found that his response to questions was generally adequate although, on occasion, his poor judgment bordered on the bizarre. The examiner noted:

"While he is capable of good reality testing and typically structures his world on a simple but sound level, he demonstrates breakthroughs of abberant thinking with phobic and morbid content."

On June 26, 1967, at the time of discharge, the doctor found that he was "capable of understanding the nature of the charge against him, of assisting in his defense, and of standing trial."

Following his discharge, he was indicted on July 7, 1967 for assaults, first and second.

The defense counsel assigned to him on July 11, 1967 had limited experience only. He had been admitted on June 28, 1967, only a few weeks before, had participated in the defense of three misdemeanors, but had no prior felony experience.

Petitioner and his counsel conferred about five times during the summer. His attorney explained the meaning of assault, first and second, to him, and the differences between them. He interviewed the arresting officers and made a motion for a bill of particulars, which was answered in August. After that, except for a brief meeting, counsel and petitioner did not confer again until October 4, 1967, the day set for trial.

At the hearing in this proceeding, defense counsel testified that the petitioner told him that he committed the acts alleged in the indictment, that the petitioner told him he had been taking pills and wanted treatment, and wanted a doctor to check him before trial. He knew that the petitioner was examined in June at the Rochester State Hospital and, on a prior occasion, had been adjudicated a youthful offender. Defense counsel tes-

tified that there was some doubt in his mind about the mental capacity of the petitioner. However, no further application was made for examination.

Petitioner's history of involvment with the law—drug taking, emotional and psychiatric disturbance, attempted suicide, and confinement—extended back to a time when he was seven years of age. In 1957, after being adjudged a juvenile delinquent, he was placed on indefinite probation. Following that, he was a continuous behavioral problem. He was expelled from school in 1959 and referred to the Wayne County Mental Health Clinic. He was charged with petit thefts again and again. During his childhood years, his home environment was deplorable. After observation at the Willard State Hospital in 1961, the diagnosis upon discharge was "Primary Behavior Disorders, Conduct Disturbance." In 1962, he was committed to the New York State School of Industry. Following this, he was returned to Willard State Hospital and, upon discharge, the diagnosis was the same as that in 1961.

Upon his admission to the Rochester State Hospital in September, 1966, the admission note said that he had been arrested about twenty times for assaults, burglaries, and thefts. He claimed that he had attempted suicide a number of times. He stated that he was married and had a daughter who was three years old but, on other occasions, he told the examiner he was single. He gave a history of occasional overindulgence in alcohol and the use of marihuana and heroin. He told the doctor that he had been in Elmira for one year, then at Woodbourne and Napanoch, where he was discharged in April, 1966. On October 12, 1966, he was discharged from the Rochester State Hospital as a "psychopathic personality, with pathologic emotionality." However, three days later, on October 15, he returned voluntarily claiming that he was depressed and was thinking about suicide. He was discharged on October 26, 1966 and again admitted a few days later, on October 28, 1966 voluntarily. He was discharged on November 2, 1966 "without psychosis."

On February 11, 1967, he was again admitted after attempting suicide by taking an overdose of pills. He said that he wanted to die because his girlfriend told him she did not love him any more. At the time of his discharge on March 22, 1967, he was diagnosed to be "without mental disorders psychopathic personality." At the time of the plea, defense counsel was not familiar at all with this prior history.

On October 4, 1967, petitioner and defense counsel expected to go to trial. When they appeared in court at 10:00 A.M., the judge ordered the jury selection to begin at 2:00 P.M. During the morning, defense counsel conferred with the Assistant District Attorney who offered to permit the petitioner to plead to assault, second degree. The District Attorney had informed defense counsel that the examining psychiatrist reported that petitioner was mentally competent. Since defense counsel believed that the government had a substantial case, he recommended this plea to his client. He again reviewed the facts of the crime with him and felt that the petitioner understood what the charge was and why they were going to court.

The plea was taken that afternoon. At that time, the judge asked the defendant if his plea were voluntary, whether any promise had been made to him concerning sentence, whether he understood his rights, and if he had fully discussed his case with his attorney. To each of these questions, the defendant made a favorable response. In addition, the following colloquy also took place between court and defendant:

"THE COURT: Now, do I understand that you are pleading guilty of your own free will?

DEFENDANT: That is correct.

THE COURT: Have you talked about this with your attorney?

DEFENDANT: Yes.

THE COURT: Now, has any promise been made to you by your attorney * * *, or by the Assistant District Attorney, or by the Clerk of the Court or anyone connected with the court, has anyone promised you anything to get you to plead guilty?

DEFENDANT: No.

THE COURT: Do you understand that when you plead guilty to assault in the 2nd degree that you are saying to this Court, you are confessing that on May 23, 1967, you assaulted one Ruth Baker with a dangerous weapon likely to produce grievous bodily harm, do you understand that you are saying to the Court, yes, I assaulted Ruth Baker?

DEFENDANT: That's correct.

THE COURT: And this occured on May 23, 1967, is that right?

DEFENDANT: That is correct.

THE COURT: Now, let me ask you this; do you claim at this time any mental disability? In other words, do you claim that you are nuts?

DEFENDANT: *I'd like to have a doctor check me before I do go to trial.* (Emphasis supplied.)

(DEFENSE COUNSEL): The Judge's question is; do you think you are insane?

DEFENDANT: I'm a narcotic.

THE COURT: In other words, you don't think you are insane?

DEFENDANT: No.

(DEFENSE COUNSEL): Tell the Judge the way you feel. Do you think you are insane?

DEFENDANT: No.

(DEFENSE COUNSEL): Do you think that you are affected by some type of drug or are you addicted, is this what you are trying to say to the Judge?

DEFENDANT: That is *correct.*

(DEFENSE COUNSEL): Well, why don't you explain it to him in your own words.

DEFENDANT: Your Honor, I was taking narcotics at the time of this crime, *I do not know what really happened on the day of the crime.* (Emphasis supplied.)

THE COURT: But you do understand now?

DEFENDANT: Yes.

THE COURT: And you are pleading guilty now to the crime of assault in the 2nd degree, is that right?

DEFENDANT: That is correct.

THE COURT: Alright, I'll accept your plea of guilty."

On November 1, 1967, he was sentenced to Elmira Reformatory where a psychological evaluation showed an I.Q. of 71.

At the hearing conducted by this court, petitioner testified that, at the time of the alleged assault, he was sniffing heroin. He stated that he had no independent recollection of the facts, but his knowledge of the facts was based solely upon what his attorney and the police related to him. He claimed that, on October 4, 1967, he expected to go to trial and wanted to raise the defense of insanity. He claims that he pled guilty only at the behest of his attorney and that, prior to coming to court, he had been given a dose of Thorazine which made him sleepy.

When the petitioner testified in this proceeding, he had difficulty in understanding the questions and the nature of the proceeding in court. He answered the questions slowly. The impression made was that, if an explanation were made to the petitioner about court proceedings and the possible consequences, it would have to be done carefully and in detail.

■ A guilty plea must be voluntarily and knowingly made. Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). A conviction based upon an involuntary plea of guilty is inconsistent with due process and is subject to collateral attack by federal habeas corpus. In

Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Supreme Court restated these principles in the following language:

"That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized. Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment. He thus stands as a witness against himself and he is shielded by the Fifth Amendment from being compelled to do so—hence the minimum requirement that his plea be the voluntary expression of his own choice. But the plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."

In North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (U.S. Nov. 23, 1970), the court stated:

"The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."

■ A judge is not relieved of his duty to make sure that the plea was understandingly and knowingly made because the defendant is represented by counsel. United States v. Lester, 247 F.2d 496, 500 (2d Cir. 1957). In McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773 (1970), after restating the proposition that in felony cases a defendant is entitled to the effective assistance of competent counsel, the court went on to say:

" * * * [T]hat if the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and that judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts."

■ Petitioner's background and the circumstances surrounding the entry of the petitioner's plea of guilty are inconsistent with the proposition that the plea was understandably and knowingly made. His response to questions by the court and his defense counsel immediately prior to the acceptance of the guilty plea did not establish that he acknowledged guilt without reservation. To the contrary, his answers revealed a challenge to the charge of assault in the second degree since he claimed he did not recall the events at the time of the alleged assault.

In seeking to determine whether or not the plea was made in a voluntary way, the court must take into consideration the cumulative impact upon the defendant of all the circumstances surrounding the making of the plea. "The totality of all of the surrounding circumstances" should be considered. United States v. Miller, 243 F.Supp. 61 (E.D.Pa. 1965), aff'd 356 F.2d 515 (3d Cir.), cert. denied, 384 U.S. 981, 86 S.Ct. 1882, 16 L.Ed.2d 691 (1966).

A consideration of all of the circumstances surrounding the making of this plea indicates that it was not made within the constitutional standards. Because of the inexperience of defense counsel, he obtained only a cursory history from his client about his background. Therefore, he did not know about the petitioner's extensive criminal and disturbed emotional record. He did not know about the petitioner's low I.Q. or appreciate the difficulty which petitioner had in understanding court proceedings. Because of his lack of knowledge of these important factors,

he was unable to intelligently discuss with his client the issues involved, and to make an intelligent appraisal of the course to be followed in this case.

After listening to the testimony of petitioner at the hearing, and keeping in mind his background, this court is convinced that he did not understand the proceedings before the judge at the time of the plea. At that time, he thought he was going to trial. More importantly, petitioner unequivocally told the court that he did not know what he was doing at the time of the alleged act. Ignoring this implicit denial of the intent to commit the crime, the court went ahead and accepted the plea. It is true that a guilty plea may be accepted, even though a defendant protests his innocence, North Carolina v. Alford, *supra,* but the offer of a plea under those circumstances must be made in a voluntary, knowing, and understanding manner.

I do not imply by this discussion that counsel's conduct of the investigation and defense of this charge deprived the petitioner of the service of effective counsel within the meaning of United States ex rel. Boucher v. Reincke, 341 F.2d 977, 982 (2d Cir. 1965), or United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967), but counsel's lack of knowledge, coupled with the petitioner's background, and the court's acceptance of the plea under the circumstances described, all contributed to a plea taken in violation of the petitioner's constitutional rights.

Therefore, the writ is sustained and the judgment of the Monroe County Court vacated. The petitioner shall be returned to the custody of the Sheriff of Monroe County for further proceedings on this indictment within fifteen days of the date of this order. If such proceedings are not taken pursuant to this order, the petitioner, through his counsel, may make further application to this court for relief. The court certifies that there is probable cause for appeal pursuant to Title 28, United States Code, Section 2253. Permission to the petitioner to proceed in forma pauperis with respect to any appeal that may be taken is granted.

The court expresses its thanks for the able assistance of Charles F. Crimi, counsel for the petitioner.

So ordered.