UNITED STATES of America ex rel.
Albert CURTIS, Petitioner,

v.

Hon. Nelson H. OTIS, Acting Warden of
Green Haven Prison, Respondent.

UNITED STATES of America ex rel.
Albert CURTIS, Petitioner,

v.

Hon. John ZELKER, Superintendent of
Green Haven Correctional Facility,
Stormville, New York, Respondent.

UNITED STATES of America ex rel.
Albert CURTIS, Petitioner,

v.

Hon. John ZELKER, Warden of Green
Haven State Prison, Stormville,
New York, Respondent.

Nos. 70 Civ. 3347, 71 Civ. 321 and
71 Civ. 4069.

United States District Court,
S. D. New York.

April 7, 1972.

Daniel R. Murdock, New York City, for petitioner; J. Peter Coll, Jr., New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, by John G. Proudfit and Iris A. Steel, Asst. Attys. Gen., for respondents.

LASKER, District Judge.

Albert F. Curtis, a New York State prisoner confined in Green Haven Correctional Facility, Stormville, New York, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Curtis is serving an indeterminate sentence of twenty years to life, imposed by the New York Supreme Court, Bronx County, following his plea of guilty on October 16, 1963, to the charge of murder in the second degree. At a hearing on a writ of error coram nobis held September 8, 1969, before Supreme Court Justice Starke, it was determined that Curtis had not been advised of his right to appeal. He was then resentenced *nunc pro tunc,* as of November 21, 1963, and given the opportunity to appeal. The conviction was affirmed without opinion by the Appellate Division (People v. Curtis, 34 A.D.2d 739, 310 N.Y.S.2d 996 (1st Dept. 1970)). Leave to appeal to the Court of Appeals was denied.

Three petitions have been consolidated before us. The first, 70 Civ. 3347, asserts that the resentencing *nunc pro tunc* deprived petitioner of his right to an effective appeal and thus violated due process and equal protection of the law. The second, 71 Civ. 321, alleges on grounds discussed extensively below that his plea was neither voluntary nor intelligently made. The third, 71 Civ. 4069, claims that petitioner's resentence was without due process because the New York Penal Law had been revised after the date of petitioner's conviction and he was not resentenced under the new law.

Finding that issues of fact were raised by the first two petitions, counsel was appointed for Curtis and an evidentiary hearing held as to those two petitions pursuant to Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The record now before us establishes that petitioner's plea was not intelligently and knowingly made. Petitioner's second application (70 Civ. 321) is therefore granted and he shall be released from custody unless the State proceeds to retry him. This grant renders the other petitions moot, and they are accordingly dismissed.

The first petition may be construed to raise the question whether the passage of time now renders it impossible for Curtis to prove his incompetence at the time of the crime. However, at the evidentiary hearing no evidence was submitted on the issue, nor has it been otherwise pressed. We make no determination of fact or law regarding the question presented, which it would appear can be appropriately raised in the further state court proceedings mandated below.

I.

Curtis was indicted on May 3, 1963, for the crime of murder in the first degree. He had been arrested April 19, 1963, and detained for the killing of a card game participant during a robbery at the Aces Up Social Club.

On May 6, 1963, Justice Martines in Supreme Court, Bronx County, appointed Herbert Feuer and Anthony Masciarelli as defense counsel. Four days later Curtis saw his lawyers for the first time in the "bull pen" of the courthouse for a few minutes prior to his arraignment. At that time he reviewed his past, telling his attorneys that a good part of his life had been in institutions for the delinquent or mentally ill, and that only two weeks before the crime took place he had been committed to Bellevue Hospital's psychiatric ward. Curtis' record is such that he had reason to press the question of his competence and responsibility. His treatment began at the age of eleven under psychiatrists associated with Johns Hopkins Hospital. At fifteen, his parents committed him to Boys Village in Maryland for truancy and misconduct which the parents could not control. Within the year he was sentenced to three years in the Maryland State Reformatory for Males for storehouse breaking, and was transferred from there to Patuxent Institute.

His history includes repeated violations of the law, confinements, and psychiatric examinations and treatments with each confinement. In 1957, the Patuxent doctors concluded that Curtis was a defective delinquent, that "he demonstrates a propensity toward antisocial behavior and is emotionally unstable to a severe degree. He cannot apparently restrain his impulses and he lacks sufficient judgment to abide by the rules of society." (Petitioner's Exh. 11 at p. 70). Petitioner was committed to Patuxent for an indefinite term as a result of these findings, and not finally released until November 2, 1962. Within three months, petitioner was examined by court-appointed psychiatrists following an assault on his wife, and declared to be a sociopsychopath. (Petitioner's Exh. 11 at p. 131).[1]

How much of this record Curtis told to Feuer at their first meeting is unclear. Feuer stated: "I believe I spoke to him on May 7th and he told me about his record, his background of being in a mental institution and I think prior arrests." (Tr., at p. 80). However, Feuer evidently had enough information to request that Curtis be examined before proceeding further:

"Mr. Feuer: Your Honor, on behalf of the defendant Curtis I ask that he be sent to Bellevue Hospital for examination. Mr. Curtis has advised me of psychiatric trouble relating back to the time he was eleven years old. He was treated at Johns Hopkins Hospital and two other hospitals in Manhattan, and recently at Bellevue. I think that this case should require hospitalization of this type and a report sent back to the Court.

"The Court: You have no objection?

"Mr. McCarthy (Assistant District Attorney): No objection.

"The Court: All right. So Ordered."

(Petitioner's Exh. 1; Transcript of Proceedings held May 10, 1963, Supreme Court, Bronx County).

Curtis was accordingly committed to Bellevue for observation. During the two-month period of commitment he had no contact with his lawyers. While Curtis was in Bellevue, Feuer met with his wife (Tr., at p. 79) and his mother and stepfather (Id., at p. 95). Feuer made some effort to obtain the Patuxent records, without success. (Id., at p. 106). He never sought to examine the file at Bellevue. (Id., at pp. 106–107).

It is reasonable to believe that Curtis' wife gave Mr. Feuer a thorough and intelligent description of Curtis' severe psychiatric problems. The record of Curtis' stay at Dannemora (see Transcript of Petitioner's Hearing of September 16, 1971—hereinafter cited as "Tr."—at pp. 116–117) includes a letter from Mrs. Curtis to the director of Dannemora dated October 29, 1965. From the excerpt which we set out in the margin[2], it will be seen that Mrs.

---

1. The psychiatric records from Bellevue Hospital set forth much of this information. (Petitioner's Exh. 11). The balance is found in the records of Dannemora to which, as indicated in the text below, Curtis was committed some time after his confinement on the plea which he now seeks to set aside. Although respondent objected to the admission of those records as post-conviction material, they are clearly relevant to further documenting petitioner's past pre-conviction mental and psychological history, and thus showing that he had, in view of his long record of which he appears to have had an awareness, good reason to press his questions as to responsibility and competence. In this light, the records are admitted and respondent's objections, on which the court reserved decision pending receipt of the records, are denied.

2. The wife's letter of October 29, 1965 to the Director at Dannemora states in part: "First let me say that I am not trying to be presumptive when I say that I've been aware that he is mentally ill for some time. I in fact had begged to have him committed to an institution such as yours so that he could receive treatment. He himself was aware of some disturbances, and in Feb. of 1963 he signed himself into Bellevue Hospital. I was called to the Hospital to speak

Curtis, who had worked as a nurse in a state hospital for three years, was greatly concerned about the state of her husband's mental health; was exceptionally capable in recalling and describing his history and symptoms, and expressed her love for him despite abuse by him. It is difficult to believe that Mrs. Curtis, who was so careful, concerned and detailed in her letter to Dannemora which involved treatment, would not have given Mr. Feuer an equally complete and impassioned presentation at a time when Curtis' life was at stake.

By letter of July 17, 1963, Bellevue Hospital reported (in accordance with the New York statutory formula) that Curtis, while "not in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge . . . or of making his defense," nevertheless evidenced "rather fragile paranoid type defenses, with underlying psychosis." (Petitioner's Exh. 3).

Curtis next saw Feuer on August 7, 1963 (again in the "bull pen" of the courthouse) before appearing in court for motions and pleading not guilty. Feuer told Curtis that he did not agree with the Bellevue report because, as petitioner put it, "it was his opinion that I was insane" (Tr., at p. 29). Feuer's testimony, while not specifically addressed to this talk with his client, was that, while he doubted Curtis was "psychotic" (Tr., at p. 100), he believed "there was a possibility" of such a condition (Tr., at p. 105). Feuer did not show petitioner the Bellevue report, although he had it in his possession. Curtis testified that he told Feuer that one of the psychiatrists examining him at Bellevue had expressed the belief Curtis was "insane."

In court that day, Feuer sought to have Curtis examined further. He came prepared with motion papers seeking the appointment of two psychiatrists to examine Curtis as to his mental condition *at the time of the crime*. The Assistant District Attorney suggested that one psychiatrist was sufficient since the state could retain its own without court order. Questioned by the Court on this point, Feuer agreed with the Assistant District Attorney. The colloquy led up to an order for appointment of a psychiatrist to explore both Curtis' present competence and his mental condition at the time of the crime:

"The Court: The application now then is for appointment of a psychiatrist in behalf of the defendant and in behalf of the People to examine this defendant to ascertain, if they can, the state of his, the mental state, rather, as of the date of the crime. Is that the point.

"Mr. Goldsmith (Assistant District Attorney): That's right.

"Mr. Feuer: Yes, sir.

to a Dr. Lincin [sic]. He informed me that he would not put Albert away because he was a wise guy who did not want to get help. I told him my reasons for believing that Albert was sick. He turned on anyone who had his best interests at heart, his mother his stepfather and me. I also expressed my fears that he would eventually kill someone and I was told that was what the electric chair was for. He was released and two or three weeks later he committed the murder for which he is imprisoned now.

"He varies from one extreme to the other. One day or week or month, he is cheerful and optimistic, a devoted husband with all sorts of plans, and quite suddenly the exact opposite. He cannot drink but would insist on trying, and alcohol transformed him, almost as dramatic a change as a Dr. Jekell and Mr. Hyde. He became violent and abusive. I had three cracked ribs, teeth knocked out and a broken jaw. To give you an idea of the violence each of these injuries resulted from one blow. They occurred on different occasions but all in the period from Dec. of '62 to Feb. '63.

"I hope some of what I've written will be helpful, although I'm sure I may have put it together rather badly, but it is a little difficult to be objective about someone you love."
(Attached to file of Albert Francis Curtis, Dannemora State Hospital, Consec. No. 7689, Year No. 98).

"Mr. Goldsmith: So that we can take action on the Bellevue report. It wouldn't affect the thought that counsel has.

"The Court: What was your objection to taking action on the Bellevue report.

"Mr. Feuer: Because if the psychiatrists that examined him now feel that they would contravert the Bellevue report by their report, I feel we couldn't confirm.

"The Court: Very well, that's a different reason. Your psychiatrist, you feel, should advise you first.

"Mr. Feuer: Yes, sir.

"The Court: With respect to their examination and whether or not you will then contravert this report.

"Mr. Feuer: Yes, sir.

"The Court: With respect to his present state of sanity.

"Mr. Feuer: Yes, sir.

"The Court: There is something to that. In fact, I think that's a good thing. However, to have the record complete, Mr. Goldsmith, I believe the People should submit an affidavit either joining in the request or not. After all, it's a capital case.

"Mr. Goldsmith: I am joining in the request."

(Petitioner's Exh. 2, Transcript of Motion and Pleading, Supreme Court, Bronx County, August 7, 1963, at pp. 4–5).

Justice Waltemade entered his decision granting the motion, and it was filed with Feuer's motion papers annexed. (Petitioner's Exh. 9). In Feuer's affidavit accompanying the application, he set forth his belief in the importance of the requested examination and his basis for that belief:

"On the basis of our investigations it is the considered and unanimous opinion of defendant's assigned counsel that the issue of the defendant's mental condition at the time of the commission of the acts charged against him as affecting his criminal responsibility or alternatively, his mental condition, affecting the degree of crime will become the crucial issue in this case. To explore properly and to revaluate these serious factors bearing on the guilt or innocence of the accused, it will be absolutely necessary in the protection of the defendant's rights to obtain competent psychiatric advice and assistance to appraise the medical significance of the facts surrounding the alleged crime and that defense counsel be authorized and empowered to employ two qualified psychiatrists as expert witnesses to examine the defendant, ALBERT CURTIS, for the purpose of advising defense counsel as to his mental condition at the time of the alleged crime and the existence of any mental disease which would affect his criminal responsibility, upon which issue the affirmative presentation of evidence is incumbent on the said defendant, or alternatively whether the defendant, at the time of the alleged crime, was mentally incapable of killing deliberately, as charged in the indictment."

(Affidavit of Herbert J. Feuer in support of motions, sworn to July 30, 1963, Petitioner's Exh. 9 [enclosed]).

"The basis for my belief, is as follows: The defendant, ALBERT CURTIS, at the age of fifteen (15) was sent to Boys Village in Maryland in response to his parents' request for assistance in handling repeated truancy. There were subsequent parole violations, recommitment and several escapes. He subsequently was sent to Maryland State Reformatory where he presented problems and was thereafter sent to Patuxent Institution. Defendant had been receiving psychiatric examination pending sentence in 1957. The impression was 'Defective Delinquent'. Psychological tests were performed in November of 1962 and resulted in a diagnosis of 'Emotional Immaturity and Passive-Aggressive

Personality.' The final diagnosis at Patuxent Institution was 'Sociopathic Personality, Antisocial Reaction'. Defendant, ALBERT CURTIS, was committed to Bellevue in February of 1963 where he remained for a period of two (2) weeks and the Bellevue diagnosis at that time was 'Psychopathic Personality'. "

(*Id.*, at p. 2).

Although Feuer indicated that he made inquiries as to psychiatrists who might be appointed, and indeed carried a proposed order with him for signature in court on August 7th, he never served or filed the order and no psychiatrist was ever appointed. Feuer testified at the instant hearing that he believed the psychiatric examination would indicate that petitioner was competent and that "I made this motion for additional time because he had a first degree murder indictment facing him." (Tr., at p. 101). He conceded that had the examination found petitioner incompetent, he would have opposed confirmation of the Bellevue report. As Feuer put it, "I thought there was a possibility but I didn't think it was the case [that petitioner was psychotic]. I didn't want to go to trial on a first degree murder indictment where a man's life was at stake." (Tr., at p. 105). Be that as it may, Feuer admitted that there was no obstacle to pursuing the psychiatric examination, as the defendant (and the Court) had every reason to believe he would do. The following colloquy at the hearing between petitioner's counsel and Feuer is illuminating in this regard:

"Q Actually all you had to do apparently was to submit an order and the psychiatrist would have been appointed to examine Mr. Curtis; would that have hindered your ability to work out some arrangement with the District Attorney's office in any way?

"A I don't think so.

"Q In other words, while you were negotiating a plea which you would consider satisfactory to represent to Mr. Curtis you could have submitted your order and had him examined by a psychiatrist to determine the state of his mental condition?

"A Yes.

"THE COURT: Why didn't you?

"THE WITNESS: Because we started discussions with the District Attorney.

"THE COURT: What was there to lose?

"THE WITNESS: Nothing to lose."

(Tr., at pp. 112–113).

At the August 7, 1963 appearance petitioner pleaded not guilty and the case was marked off the calendar and put down as ready for trial at the call of the District Attorney. Thereafter defense counsel for Curtis met with the District Attorney's office several times, and when the District Attorney consented to reduce the charge if Curtis would plead the case was restored to the calendar.

At some time in August or September 1963, Feuer visited Curtis for the first and only time at the Bronx House of Detention. He told Curtis that the District Attorney's office offered to accept a guilty plea to a lesser offense. Curtis testified that during this meeting, which he recalls lasted some fifteen minutes, Feuer told him that "the court had destroyed my defense . . . and that he could not take me to trial with one psychiatrist . . . and that I had no defense [of insanity], and that I would be stupid to continue to try to go to trial without this." (Tr., at p. 33. See also Feuer testimony, Tr., at 88.) Curtis stated that Feuer did not tell him at this time what the lesser offense was. (Id., at pp. 33–35).

When Curtis was brought to court on October 8, 1963, he met briefly, again in the "bull pen", with his other lawyer, Masciarelli, who urged that he plead to the reduced charge, emphasizing that he would receive a sentence less than life. Feuer indicated that he, too, "most like-

ly told him [Curtis] that the judge would give him less than that [life]." (Tr., at p. 85).

Petitioner and his counsel then appeared before Justice Lyman. The Assistant District Attorney moved to confirm the Bellevue report, and Curtis' counsel consented. After a bench conference between Feuer, Masciarelli, the Assistant District Attorney and the Court at which it was indicated that the District Attorney would "accept murder 2 as a reduced plea," (Tr., at p. 107) the matter was adjourned to October 22nd. Feuer stated that this adjournment was provided so that defense counsel could confer with their client. They did so and "told him to think about it, think about the offer of the reduced plea." (Tr., at p. 84). Feuer recalled that he "told him that the District Attorney offered murder 2 and he would not face the death penalty." Up until that time Curtis had not indicated his willingness to plead guilty. Shortly after the October 8th appearance in court Curtis was visited by his mother. He summarized the conversation and its impact as follows:

"Well, she said that after she had talked to the lawyer that he told her that I didn't have a defense and I had a bad probation report and I had many other things that were against me and that I should plead guilty and not try to go to trial as I had intended to, and I didn't want to go along with it, and she started to cry and I told her 'All right, I will plead guilty.' " (Tr., at pp. 39–40).

On October 16th Curtis was brought to court and met briefly with Feuer, again in the "bull pen." Curtis recalled being advised by Feuer that he would be asked certain questions by the judge at the pleading, and being told what answers he should make. When Curtis "asked the counsel about the psychiatrist that the court had appointed me . . . he said, 'don't worry about it right now. Everything was all right.' " (Tr., at p. 42).

Curtis then appeared with his co-defendant before Justice Lyman for plead-

ing. The Assistant District Attorney recited the events alleged to constitute the crimes and the role ascribed to each defendant. The following exchange then took place:

"The Court: Albert Curtis and James Lester, did you listen to Mr. McCarthy, Andrew McCarthy, the Assistant District Attorney recite the facts in connection with this crime you committed?

"The Defendant Curtis: Yes.

"The Defendant Lester: Yes, sir.

"The Court: All right, are those facts true?

"The Defendant Curtis: Yes.

"The Defendant Lester: Yes, sir.

"The Court: Now, Albert Curtis, I ask you whether you did on April 18, 1963, at 676 Jefferson Place in the Bronx participate in an act which caused the death of Abner Langford, an act which constitutes the crime of Murder in the 2nd degree?

"The Defendant Curtis: Yes, Your Honor.

.    .    .    .    .

"The Court: No[w], I'm asking each one of you, I want an answer from each one of you. I'm adressing my remarks now to both of you, did anyone promise you anything, the District Attorney, the Court or your lawyers?

"The Defendant Curtis: No, sir.

"The Defendant Lester: No, sir.

"The Court: Did anyone force you to take this plea?

"The Defendant Curtis: No, sir.

"The Defendant Lester: No, sir.

"The Court: Are you taking this plea of your own free will and accord?

"The Defendant Curtis: Yes, sir.

"The Defendant Lester: Yes, sir.

"The Court: I'm asking you Albert Curtis, are you guilty of the crime you are now entering a plea to

which is Murder in the 2nd Degree?

"The Defendant Curtis: Yes, Your Honor.

.        .        .        .        .        .

"The Court: Take the pleas."

(Petitioner's Exh. 5, Transcript of Pleadings, Supreme Court, Bronx County, October 16, 1963, at pp. 10–12).

Curtis' plea of guilty was then entered routinely. He was not instructed that by pleading guilty he waived all defenses, and no inquiry was made as to his lack of competence, whether Curtis had been examined by a psychiatrist pursuant to the grant of the motion for that purpose, or whether he knew the consequences of a plea to second degree murder. (Transcript of Pleadings, supra). Indeed, none of the transcripts of petitioner's appearance before Justice Lyman indicates that he was appraised of Justice Waltemade's order for a psychiatric examination. He was not advised of his right to appeal.

Curtis again saw Feuer and Masciarelli just before sentencing on November 21, 1963. At their "bull pen" meeting, Curtis states, "I had asked them what about the psychiatrist that the court appointed to me and they said they would take care of it and that right now their main interest was trying to be able to have it so the judge would give me a smaller sentence." (Tr., at p. 46). Sentence of 20 years to life was then imposed. Curtis never saw his counsel again. He states, "After sentence I went to turn around to see my lawyer and he was leaving the courtroom very quickly." (Tr., at p. 48).

Within weeks of his sentence, Curtis wrote from prison to Feuer asking about the psychiatric examination which had not been held and expressing his concern. He requested a copy of the Bellevue report. Feuer replied that "it will not be possible for me to send you a copy of the psychiatric report which you requested, as this report is a privileged and confidential communication and was addressed to Supreme Court Judge Thomas Dickens." (Petitioner's Exh. 8). It was not until four years later that Curtis was able to obtain a copy of the Bellevue report. He wrote Bellevue directly at that time, and the hospital told him he would have to request that it be sent to him through either a doctor or lawyer. He then requested that the hospital send the report to Feuer and asked Feuer to forward it to him.

Although of marginal probative value as to his mental state at the time of the plea itself, it is instructive to note that within a year of Curtis' sentencing he experienced delusions of threats on his life, and on November 5, 1965, was adjudged mentally ill following a hearing before a judge of the Clinton County Surrogate's Court. He was then committed to Dannemora State Hospital pursuant to § 383 of the New York Correction Law, McKinney's Consol. Laws, c. 43. The files from Curtis' one-year Dannemora commitment are in evidence before us and reveal the depth of his mental disturbances at that time.

## II.

The standard test as to whether a guilty plea comports with due process of law is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In *Brady*, the Court observed (at 748, 90 S.Ct. at 1469) that "the plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. [citations omitted]."

We find that Curtis' plea was neither knowingly nor intelligently made.

■ Curtis' constitutional rights were clearly violated. The conviction of a legally incompetent defendant offends due process. Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). Where a sufficient doubt is raised as to a defendant's competence to stand trial it is the duty of the trial court to determine that matter. The copious evidence as to Curtis' history raised such a doubt. Although the facts were not brought to the attention of the judge who took the plea or imposed sentence, they were brought to the attention of a judge who earlier heard the matter, and who without hesitation granted the motion of Curtis' counsel for a psychiatric examination.

■ Curtis' right to a determination of his competence was never waived. Pate v. Robinson, 383 U.S. 375, 384, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). He himself took no action on the matter, always believing that the examination was still to occur. His counsel could not waive the right except with their client's express and understanding approval (assuming, which is far from clear, that he was competent to give it). As the Court said in Kibert v. Peyton, 383 F. 2d 566, 569 (4th Cir. 1967):

> "The Supreme Court has held categorically that the defense of incompetency to stand trial cannot be waived by the incompetent, Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L. Ed.2d 815 (1966), and it ineluctably follows that his counsel cannot waive it for him by failing to move for examination of his competency."

■ But we need not rely on negatives. The crowning violation of Curtis' unwaived rights is that he was persuaded to plead guilty on an assumption to which he was positively misled: that the arrangements for a psychiatric examination to support an insanity defense were proceeding normally and remained viable in spite of the plea. He was never advised that his plea of guilty waived the defense. In short, his plea was based on an entirely false assumption and therefore without knowledge of its consequence, that is, its finality. A plea made under such circumstances is neither knowing nor voluntary.

Counsels' failure to follow through with the ordered examination, their failure to advise Justice Lyman that it had been ordered, and their clear unwillingness to provide the Bellevue report to Curtis or otherwise consult him actively in framing his defense, has resulted in a situation where to this day, even upon the record so far developed, it cannot be said whether Curtis was competent either at the time of pleading or at the time of the crime. Furthermore, nowhere in the record of the trial court proceedings is it shown that Curtis knowingly waived his right to jury trial, that he waived his right to confront witnesses against him or any of his defenses, that he fully understood what second degree murder was under state law and what the consequences to a plea on that charge might be; in other words, that he understood all the alternatives available to him sufficiently to make an intelligent choice among them. Indeed, it is regrettable to note that he was never even questioned on any of these points. No intelligent waiver has taken place. See Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948); Brady v. United States, supra.

■ Beyond the clear deprivation of Curtis' right to due process of law, violation of his Sixth Amendment right to effective assistance of counsel is seriously raised here.

> "If counsel's representation is so 'horribly inept' as to amount to 'a breach of his legal duty faithfully to represent his client's interests' . . . there has been a lack of compliance with the fundamental fairness essential to due process." United States ex rel. Maselli v. Reincke, 383 F.2d 129, 132 (2d Cir. 1967).

The record not only is devoid of detailed consultations between defendant and

counsel in which facts, charges and possible defenses were discussed in depth, but establishes that the defendant met relatively few times with his counsel and those meetings, generally limited to ten or fifteen minutes, occurred almost exclusively in the "bull pen" at the courthouse. Counsel may have acted sincerely in their client's best interests as they saw them, but that is no excuse for the failures evidenced in the record here. Counsel knew of Curtis' mental illness from talks with Curtis, his mother, and his wife. To disregard these circumstances and induce Curtis to plead without his understanding what was afoot may well go beyond mistaken "good-faith evaluations." While trial counsel's behavior may not have shocked the conscience as a constitutional matter,[3] it fell shockingly below responsible professional standards.

Accordingly, we hold that Curtis' plea was not knowingly and intelligently made and that the writ should issue.[4]

We are not unmindful that Curtis' record of mental illness and antisocial behavior is ground for serious concern. Nevertheless, in the circumstances of this case, the Constitution commands his release; his rights may not be curtailed on speculation as to whether his future conduct will be acceptable. The dilemma caused by the requirement that a person with Curtis' history must be released results directly from the failure of his counsel and the prosecuting authorities to assure his rights at the time of trial.

We express sincere thanks to Daniel R. Murdock and J. Peter Coll for the highly professional service they have rendered the petitioner in this case.

The petition for a writ of habeas corpus is granted and the judgment of conviction based on the petitioner's plea of guilty is vacated on the condition that,

if Curtis is found presently competent to stand trial, the state will within 30 days of the filing of this opinion set a date for retrial no later than 90 days hereafter. This arrangement will give the parties the greatest assurance of securing the witnesses necessary for a retrial of a case relating to facts which occurred nearly ten years ago.

There is probable cause for appeal pursuant to Title 28, U.S. Code, § 2253. Permission is granted to the petitioner to proceed in forma pauperis in respect to any appeal that may be taken.

It is so ordered.

3. " 'A lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice.' " United States ex rel. Boucher v. Reincke, 341 F.2d 977, 982 (2d Cir. 1965).

4. Cf. United States ex rel. DuBois v. Mancusi, 325 F.Supp. 694 (W.D.N.Y.1971), in which the writ was issued in circumstances strongly resembling those here.