Harold T. Garrity, J.
The District Attorney, on oral motion, moves to dismiss the indictment charging the defendant with murder in the first degree. It is urged that ‘ the defendant was insane at the time he committed the crime in question and hence cannot be successfully prosecuted.”
The indictment was returned in January of 1953, and shortly thereafter the defendant was committed to the County Psychiatric Institute for a determination as to his capacity to comprehend the charge or of making his defense. The subsequent report advised the court that the defendant was “ by reason of insanity, unable to defend himself,” whereupon he was committed to Matteawan State Hospital, remaining at that institution until discharged in August of this year as recovered and sent back to Grasslands Hospital. The latter institution reports that the defendant is now capable of understanding the charge and making his defense.
Insanity is a most complex disease and the most difficult to understand. As a legal problem, it is particularly difficult and exceptionally so because the courts, lawyers and psychiatrists have been indulging for more than a century in a fantastic semantic charade.
The authorities, legal and medical, decrying the so-called “ McNaughton Formula ”, constitute a most impressive array. *377 Promulgated by the House of Lords in the year 1843, in response to a series of hypothetical questions (M’NagMen case, 10 Cl. & Fin. 200), it is widely regarded as unrealistic, unsatisfactory and unscientific. (See “ Psychiatry v. McNaughton Formula ” by Joseph Ehrlich, editorial page, N. Y. L. J., Oct. 28, 30, 31, 1957, for a most erudite and comprehensive review.)
The Penal Law (§ 1120) excuses a defendant from criminal responsibility only “ upon proof that, at the time of committing the alleged criminal act, he was laboring under such a defect of reason as: 1. Not to know the nature and quality of the act he was doing; or, 2. Not to know that the act was wrong.”
The most superficial familiarity with the problems of mental illness and criminal responsibility renders the statutory definition untenable on any medical or logical basis. The definition was taken verbatim from the M’NagMen case and has been preserved intact for more than a century as if it epitomized man’s knowledge and wisdom in this field.
Many eminent jurists have grappled with these criteria constituting insanity, but these judges have encountered the insurmountable obstacle of squeezing the square legal definition of insanity into the round area of medical knowledge resulting from the tremendous advances made by psychiatric and medical research. The gist of the dilemma is quite simple: we demand of psychiatrists that they testify as to whether or not a defendant is insane, a term or classification our medical brethren refuse to acknowledge as part of their lexicon since they deny it has any validity in their science. It is as if a physician were to be asked whether or not a patient was suffering from “ humors ” and persists in answering that there is no such disease, conceding only that long ago doctors used such term to label symptoms they could not accurately diagnose or treat.
The very definition makes inevitable the intellectual gymnastics — however nobly inspired and humanitarian the purpose —whereby the medical witness, with scientific tongue-in-cheek, ultimately states that a defendant is “ insane ”. What is necessarily intended thereby is not acceptance of the term or concept but surrender to its use to achieve the desired end that the defendant be dealt with as a patient, isolated and hospitalized rather than executed or jailed as a criminal.
The realty of the medical expert’s embarrassment is of much concern to psychiatrists. As an eminent psychiatrist, Dr. Gregory Zilboorg, puts it: “except for totally deteriorated, drooling, hopeless psychotics of long standing, and congenital idiots — who seldom commit murder or have the opportunity to commit murder — the great majority and perhaps all mur *378 derers know what they are doing, the nature and quality of their act, and the consequences thereof, and they are therefore legally sane ’ regardless of the opinion of any psychiatrist.” (Mind Medicine and Man, p. 274.)
The definition evolved more than 700 years ago by Lord Chief Justice Bbaotok', a clergyman steeped in the Justinian Code, spoke of “lacking in mind and reason ”, which is at least partially more consonant with modern concepts than the McNaughton rule.
This court will not presume to attempt a substitute definition. We do, however, suggest the New Hampshire rule (State v. Jones, 50 N. H. 369); that recently adopted by the Court of Appeals for the District of Columbia in 1954 (Durham v. United States, 214 F. 2d 862); and that contained in the Model Penal Code of the American Law Institute (Tentative Draft No. 4, § 4.01) as meriting serious study by the appropriate legislative authority.
The latter definition reads: “ A person is not responsible for criminal conduct if at the time of such conduct as a resiilt of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.”
We submit the latter is far superior to the McNaughton rule. (See, also, Prof. Henry Weihofen, Isaac Bay Memorial Award Lectures, p. 60 et seq.)
Our legal literature is filled with the opinions of appellate judges who have endeavored to use the McNaughton formula as a tool, however ill-adapted, with which to fashion a better definition; but to no avail. Judge Cabdozo in 1928 in an address entitled What Medicine Can Do for Law ’ ’, stated that the definition “ has little relation to the truths of mental life” (Cardozo, Selected Writings, pp. 371, 787), and in People v. Schmidt (216 N. Y. 324, 338-339) some 14 years previously, held: “ The definition of insanity established by the statute as sufficient to relieve from criminal liability, has been often and harshly criticized (see, e.g. State v. Pike, supra [49 N. H. 399]; State v. Jones, supra; Parsons v. State, 81 Ala. 577). Some states reject it altogether (Parsons v. State, supra, and cases there cited). A recent ease in Massachusetts (Comm. v. Cooper, 219 Mass. 1, 5) says that an offender is not responsible if he was ‘ so mentally diseased that he felt impelled to act by a power which overcame his reason and judgment and to him was irresistible. ’ That is not the test with us (Flanagan v. People 52 N. Y. 467; People v. Taylor, 138 N. Y. 398; Penal Law, § 34). *379 Whatever the views of alienists and jurists may be, the test in this state is prescribed by statute, and there can be no other (People v. Silverman, 181 N. Y. 235, 240).” (Emphasis supplied.)
Yet in posing a hypothetical situation in which a devoted mother slays her child while deluded, the learned Judge concedes that such defendant could be held guilty under our definition, but that “ No jury would be likely to find a defendant responsible in such a case, whatever a judge might tell them ”. (People v. Schmidt, supra, p. 339.) Unfortunately, this shifts the burden upon a jury to acquit by arriving as its own sensible determination that the defendant was irresponsible, ignoring the statutory definition. Since a jury need not write an opinion, it is spared the unenviable task of reconciling an absurdity with the facts of life.
Justice Frankfurter recorded his views in rather blunt language: “ If you find rules that are, broadly speaking, discredited by those who have to administer them * * * then I think the law serves its best interests by trying to be more honest about it * * * to have rules which cannot rationally be justified, except by a process of interpretation which distorts and often practically nullifies them * * * is not a desirable system * * * I think the M’Naghten Rules are in large measure shams. That is a strong word, but I think the M’Naghten Rules are very difficult for conscientious people, and not difficult enough for people who say, We’ll just juggle them’.” (Testimony before the Royal Commission on Capital Punishment. Report, p. 102; see Weihofen (supra, pp. 61, 185, note 2.)
Apart from the plethora of precedent, no judge may properly overrule a statutory rule of law, particularly one of such longstanding and which has preserved despite the onslaughts of so many notable jurists and attorneys. The Legislature is well aware of these criticisms, but obviously has not agreed, for the statute remains unchanged.
The Legislature is not unaware of the term “ mentally ill person ” for in the Mental Hygiene Law (§ 2, subd. 8) it prescribed the following definition: “A ‘ mentally ill person ’ means any person afflicted with mental disease to such an extent that for Ms own welfare or the welfare of others, or of the commuMty, he requires care and treatment ”; and in subdivision 15 thereof, in another context, it provides that the words: “‘insane,’ ‘ insanity, ’ ‘ lunacy,’ ‘ mentally sick,’ ‘ mental disease ’ or ‘ mental disorder,’ or any of them, are used, they shall have equal significance to the words ‘ mentally ill.’ ”
*380 It is also significant that section 28 of the General Construction Law, defines “ lunatic ” and “ lunacy ” simply to “ include every kind of unsoundness of mind except idiocy.”
It is not too difficult to evolve “ distinctions without differences ” so as to construe the statute to make it conform to our own predilections. This, however, would be rank “ judicial legislation ” in an area well known to the Legislature. It has adhered to the McNaughton Buie by studied negative action. When the judicial function impinges upon the legislative, no matter how salutary or noble the motives, it subverts the constitutional structure of our State Government.
On the three and one-half page record before me — and the charge here is murder in the first degree — I cannot in good conscience as a Judge hold that as -a matter of law the defendant was insane on December 29,1952. Actually there is a dearth of information relating to defendant’s mental condition at the time of the crime. We have only the flat, unadorned assertion, based upon the recollection of the present psychiatrist of the conclusions contained in a report by another psychiatrist- — ■ since deceased — made shortly after the arrest almost six years ago and which report was not submitted to this court.
There are virtually no supporting facts before this court relating to the defendant’s conduct which compel concurrence. On the contrary, considering the circumstances surrounding the slaying by defendant of his spouse, an issue of fact as to his sanity within the statutory definition is presented. We avoid further discussion lest we prejudge any defenses and state merely in conclusory terms the bases of our determination of the motion.
However reluctantly, I cannot rule that the defendant, as a matter of law, did not know what he was doing or that it was wrong. However much I may deprecate the McNaughton Buie, I am judicially bound by it. The post-slaying attempted suicide, although probably indicating mental illness, is not insanity per se under our criminal law. As a violation of natural law — and until recently itself a crime under the Penal Law — it might indicate the very mens rea which is the foundation for the McNaughton doctrine. Under the Penal Law, attempted suicide does not conclusively establish insanity for insanity is not, by definition, the equivalent of mental illness in our criminal law.
We are well aware and profoundly concerned that our holding might conceivably result in the gravest of all possible consequences to the defendant. We would be less than candid were *381 we not to admit being tempted to choose the far easier course of granting the motion. There is, however, the paramount consideration that the determination must be in accordance with the law, and the McNaughton Rule is still our law.
Motion denied. Submit order.