**UNITED STATES of America ex rel. Albert CURTIS, Petitioner-Appellee,**

v.

**Hon. John ZELKER, Superintendent of Green Haven Correctional Facility, Stormville, New York, Respondent-Appellant.**

No. 900, Docket 72–1536.

United States Court of Appeals, Second Circuit.

Argued June 6, 1972.

Decided July 17, 1972.

John G. Proudfit, Asst. Atty. Gen., (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., Lillian Z. Cohen, Asst. Atty. Gen., New York City, of counsel), for respondent-appellant.

Daniel R. Murdock, New York City (Michael R. Dacey, New York City, of counsel), for petitioner-appellee.

Before FRIENDLY, Chief Judge, and MANSFIELD and MULLIGAN, Circuit Judges.

MANSFIELD, Circuit Judge:

The Superintendent of New York's Green Haven Correctional Facility at Stormville, New York, appeals from a judgment of the district court for the Southern District of New York granting a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to Albert Curtis, a state prisoner serving a sentence of from 20 years to life as a result of his plea of guilty to second degree murder in 1963, on the ground that his guilty plea was not knowingly and intelligently made. We reverse.

On May 3, 1963, a Bronx County Grand Jury filed an indictment charging

Curtis, then 25 years old, with first degree murder based upon his killing of a 43-year old man at the Ace's Up Social Club in the Bronx during the course of a robbery on April 18, 1963. According to statements later made by the District Attorney at the time of Curtis' guilty plea, which were not disputed, the state was prepared to prove that on the latter date Curtis, armed with a 38-caliber revolver which he was entitled to carry as a special police officer (guard) in New Jersey, met in the Bronx with one James Lester, with whom he discussed the proposed robbery. Thereupon they went to Lester's apartment where Lester obtained a rifle and, after learning from a third party that a card game was in progress at the Ace's Up Social Club, they proceeded to the Club where approximately 10 persons were engaged in a card game, with money on the tables.

Curtis and Lester, with guns drawn, backed the participants against the wall and proceeded to take the money from the card tables. At that point one of the card players, Albert Langford, who apparently was intoxicated, either lunged or fell toward Curtis, who turned and fired four shots at Langford, killing him. In the course of fleeing from the premises, Curtis reloaded his revolver with two bullets, but upon observing a passing police patrol car, threw the revolver in a sewer. He and Lester were later apprehended and Curtis led the police to the sewer where the revolver was recovered. According to the District Attorney several of the robbery victims were prepared to identify Curtis as the person who killed Langford during the course of the robbery.

Thus the state appeared to have a strong case against Curtis, with the likelihood that upon a trial he would be convicted of first degree murder, for which he could be sentenced to death. Following the filing of the indictment on May 3, 1963, two counsel, Herbert Feuer and Anthony Masciarelli, were appointed by the Bronx Supreme Court to represent him. Curtis admitted to Feuer that he had killed the victim. Interrogation of Curtis by his counsel, however, revealed a history of anti-social tendencies and commitment to institutions, which offered the possibility of an insanity defense. From the time he was 15 years old in 1953 he had been in and out of various institutions for truants and reformatories. In 1957 as the result of being sentenced on a burglary charge he was sent to the Patuxent Institute in Maryland, where he was found to be a defective delinquent. Finally released in November of 1962 by order of the Baltimore City Criminal Court, he came to New York where in 1963 he was charged by his wife with assault, as a result of which he was briefly examined by one Dr. Fishman on February 7, 1963.

According to the records before us Dr. Fishman "found no psychotic tendencies, but indicated the patient was a sociopathic personality". Four days later Curtis voluntarily committed himself to the Bellevue Psychiatric Hospital. He was observed there for more than two weeks and released on February 27, 1963, with a final diagnosis of "sociopathic personality,"[1] a term which describes a mental state characterized by marked anti-social tendencies, but which does not connote insanity or mental incompetency as those terms are legally defined. See generally, L. Hinsie and R. Campbell, Psychiatric Dictionary 600, 682–83 (3d ed. 1960).

In view of the foregoing history, Curtis' counsel moved the court for his

---

1. The finding in detail was that "The psychiatric examination in this hospital does not indicate that we are dealing with a person who is psychotic. We feel that he is a severe psychopath who, when drunk, can act quite abusively and assaultively. We do not feel that he is committable and would strongly recommend that he seek treatment on an out- patient basis only." As one court has had occasion to note, the terms "sociopathic personality" and "psychopathic personality" are interchangeable. Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, 729 n. 4 (1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed. 2d 1067 (1958).

commitment to Bellevue Psychiatric Hospital for examination into his competence to stand trial, pursuant to former New York Code of Criminal Procedure § 658 [1939], N.Y.Laws, ch. 861, § 2 (repealed 1971).[2] With the acquiescence of the prosecution the court granted the motion and Curtis was committed to Bellevue on May 10, 1963. Pursuant to statute, two qualified psychiatrists were appointed to conduct his examination.[3] He remained in Bellevue under their observation for two months, during which time he appears to have been thoroughly examined; records of prior mental examinations, both at the Patuxent Institute and at Bellevue, were obtained and considered.

On July 17, 1963, the Bellevue psychiatrists made their report to the court (the "Bellevue Report"), in which both fully concurred, setting out in some detail Curtis' mental history, and finding that he was competent to stand trial. They concluded that "At this time, although there are projective trends, he is in good contact with reality and well aware of the circumstances with which he is now faced." They diagnosed Curtis as "Not psychotic; Sociopathic Personality with aggressive and impulsive features."[4] According to the statutory formula then in effect they found that Curtis "is not in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge, indictment, proceedings, or of making his defense."[5] A copy of the report was furnished to Curtis' counsel.[6]

2. The statute provided:
"If at any time before final judgment it shall appear to the court having jurisdiction of the person of a defendant indicted for a felony or a misdemeanor that there is reasonable ground for believing that such defendant is in such a state of idiocy, imbecility or insanity that he is incapable of understanding the charge, indictment or proceedings or of making his defense, or if the defendant makes a plea of insanity to the indictment, instead of proceeding with the trial, the court, upon its own motion, or that of the district attorney or the defendant, may in its discretion order such defendant to be examined to determine the question of his sanity."

3. Former Code Crim.Proc. § 659 [1939], N.Y.Laws, ch. 861, § 2 (repealed 1971).

4. Contrary to the district court's impression, their report did not state that Curtis exhibited "rather fragile paranoid type defenses, with underlying psychosis." This quoted phrase appears to have been a tentative diagnosis by a psychologist who examined Curtis midway through his commitment in June, 1963, and is recorded on a plain, unidentified sheet of white paper in the hospital records which were produced for the district court. It is clear from the final report of the two psychiatrists that the tentative diagnosis of the psychologist was not shared by them.

5. Former Code Crim.Proc. § 662 [1953], N.Y.Laws, ch. 785, § 2 (repealed 1971),

required that the psychiatrists transmit to the court "a full and complete report" including a finding "that the defendant is, or is not, at the time of such examination in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge against him or the proceedings or of making his defense." We do not consider this test of competency to stand trial to be materially different from that stated by the Supreme Court in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), which is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." It is the Dusky standard which must be applied by a federal court reviewing a state conviction. See, e. g., United States ex rel. Fitzgerald v. LaVallee, 461 F.2d 601 (2d Cir. 1972); Noble v. Sigler, 351 F.2d 673 (8th Cir. 1965), cert. denied, 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81 (1966). Cf. People v. Hudson, 19 N.Y. 2d 137, 278 N.Y.S.2d 593, 225 N.E.2d 193 (1967). Even assuming, arguendo, that application of the Dusky standard could lead to a different result than application of the state test in some cases, it would not have that effect here.

6. Former Code Crim.Proc. § 662–a [1942], N.Y.Laws, ch. 284, § 2 (repealed 1971), required that a copy of the report be served on the district attorney and the defendant's counsel as well as the court.

Curtis' outlook at this stage in the proceedings was grim indeed. The state had an apparently ironclad first degree murder case against him and was pressing for trial. Curtis had admitted the essential incriminating facts to his counsel and had impressed his counsel in their brief discussions as coherent and capable of understanding thoughts communicated to him with respect to his case. As the result of a two-month impartial psychiatric study he had been pronounced sufficiently sane to stand trial. In view of the two reports by Bellevue psychiatrists, one immediately before and the other after the crime, it appeared likely that a further psychiatric examination would fail to provide a basis for a defense of insanity.

In an effort to delay the apparently relentless march toward trial, Curtis' counsel nevertheless moved the court for appointment of two psychiatrists to examine Curtis to determine whether or not he was legally sane at the time of the crime. In the affidavit submitted with the motion Feuer averred that counsel made "no claim that the defendant is presently insane or of unsound mind. No claim is made that the defendant is incapable of understanding the charge or the proceedings against him or of making his defense." Curtis, who was present in court on August 7, 1963, when the motion for appointment of the additional psychiatrists was made, later testified at the habeas corpus hearing held by Judge Lasker that he believed that Feuer thought that he was not sane at the time when the crime was committed.[7] On August 7, 1963, the court, with the acquiescence of Feuer,

granted the motion to the extent of authorizing the appointment of one psychiatrist for Curtis, with the prosecution to provide one for the state. Feuer decided at that time not to move to confirm the Bellevue Report. At the August 7 hearing Curtis entered a general plea of not guilty.

■ At this stage a new development occurred. As the result of several discussions with Feuer the District Attorney indicated that he would be willing to reduce the charge from first degree murder, which could result in imposition of the death penalty, to second degree murder, which carried a penalty of a minimum of 20 years and a maximum of life imprisonment, provided Curtis pleaded guilty to the latter. Although Feuer could have proceeded to implement the court's order authorizing a further psychiatric examination, he chose to hold up the examination pending consultation with Curtis regarding a plea to the lesser charge, believing that a further examination would merely confirm Curtis' competency.[8] There followed discussions between Curtis and his counsel, as to which conflicting versions were given by them in later testimony before Judge Lasker. Viewing the proof in the light most favorable to Curtis, it appears that upon a visit to Curtis in jail Feuer told him that "the court had destroyed my defense . . . and that he could not take me to trial with one psychiatrist . . . and that I had no defense [of insanity], and that I would be stupid to continue to try to go to trial without this." According to Curtis, Feuer advised him that if convicted of murder in the first degree, he

---

7. Curtis testified that he thought his counsel "was asking the court for—to appoint expert witnesses in my behalf at the court expense because I was unable to afford it, and that he felt that I was insane—I was not sane *at the time of the commission of the crime.*" (Emphasis supplied).

8. Counsel's opinion as to competency, as we have recently noted, is entitled to probative value. United States ex rel.

Roth v. Zelker, 455 F.2d 1105 (2d Cir. 1972) (Dkt. #71-1889). However, in view of the district court's findings we do not rest our decision upon it in this case. Although Feuer testified that he had "nothing to lose" in pressing forward with the further psychiatric examination, if it should result in a finding that Curtis was not insane at the time of the crime, the District Attordney would be free to withdraw from the plea bargaining discussions and to insist upon going to trial.

would face the electric chair whereas if he pleaded guilty to a lesser offense (not then denominated), he would get less than life imprisonment.

On October 8, 1963, Curtis and both of his counsel appeared in court; again, according to Curtis, he was advised, this time by Masciarelli, that his best course was to plead guilty because he had no defenses. At this appearance Curtis' counsel consented to confirmation of the Bellevue Report, which had found him competent to stand trial. Curtis denied knowledge of what happened in court on that day. Shortly thereafter Curtis' mother came to visit him in jail and told him, according to his testimony, that his lawyer had

> "[T]old her that I didn't have a defense and I had a bad probation report and I had many other things that were against me and that I should plead guilty *and not try to go to trial* as I had intended to, and I didn't want to go along with it, and she started to cry and I told her 'All right, I will plead guilty.'" (Emphasis supplied).

Having made his decision, Curtis appeared in court on October 16, 1963, and pleaded guilty. At the time of the plea the inquiry of the court was limited to whether Curtis admitted committing the crime with which he was charged (the details of which were recited by the prosecutor), whether Curtis had been induced to plead guilty by any promise on the part of his lawyer, the court or the prosecutor, and whether he was pleading of his own free will. Curtis admitted the essential incriminating facts and denied being coerced or overborne.

On November 21, 1963, the court sentenced Curtis to a term of 20 years to life. No appeal was taken. However, on September 11, 1969, as the result of state court *coram nobis* proceedings instituted by Curtis to vacate the conviction on the ground that he was not advised of his right to appeal, he was resentenced *nunc pro tunc* to the same term. His conviction was affirmed without opinion by the Appellate Divi-

sion, People v. Curtis, 34 A.D.2d 739, 310 N.Y.S.2d 996 (1st Dept. 1970). Leave to appeal to the New York Court of Appeals was denied.

During 1970 and 1971 Curtis filed three petitions in the district court for federal writs of habeas corpus, seeking relief on various grounds. After conducting an evidentiary hearing in accordance with Townsend v. Sain, 372 U. S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), at which Curtis and Feuer testified, Judge Lasker in a considered opinion, which apears at United States ex rel. Curtis v. Otis, 344 F.Supp. 728 (S. D.N.Y.1972), concluded that a writ should issue on the ground that Curtis' guilty plea was not knowingly and intelligently made. Although the principal basis of Judge Lasker's opinion appears to be his conclusion that Curtis was misled by his counsel into pleading guilty on the erroneous assumption "that arrangements for a psychiatric examination to support an insanity defense were proceeding normally and remained viable in spite of the plea", three other grounds are suggested: (1) that in view of doubts as to whether Curtis was competent the state court should not have accepted his guilty plea before obtaining another psychiatric diagnosis; (2) that the conduct of his court appointed counsel "fell shockingly below responsible professional standards"; and (3) that the record of the state trial court proceedings failed to disclose a knowing waiver of his constitutional rights.

■■ Before turning to the merits, review of a few well established governing principles seems advisable. Upon Curtis' petition for a writ he assumed the burden of establishing by a preponderance of the evidence that his 1963 guilty plea was not voluntarily and intelligently made. United States ex rel. Schuster v. Herold, 410 F.2d 1071, 1085 (2d Cir.), cert. denied, 396 U.S. 847, 90 S.Ct. 81, 24 L.Ed.2d 96 (1969); Papalia v. United States, 333 F.2d 620, 621 (2d Cir.), cert. denied, 379 U.S. 838, 85 S.Ct. 74, 13 L.Ed.2d 45 (1964); Grennett v. United States, 113 U.S.App.D.C. 202,

403 F.2d 928, 930 (1968); Johnston v. United States, 292 F.2d 51, 53 (10th Cir. 1961). Upon this appeal our function is limited to determining whether the district court, in concluding that Curtis had met that burden, properly applied controlling legal standards and, if so, whether its factual findings meet the test of Rule 52(b), F.R.Civ.P.

 It must be recognized that while a guilty plea, to be valid, must be voluntary and represent an intelligent choice among alternative courses of action available to the defendant, North Carolina v. Alford, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); Machibroda v. United States, 368 U.S. 487, 493, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962), a defendant's mistaken subjective impressions gained from conferences with his legal counsel, in the absence of substantial objective proof showing that they were reasonably justified, do not provide sufficient grounds upon which to set aside his guilty plea. United States ex rel. LaFay v. Fritz, 455 F.2d 297 (2d Cir. 1972), cert. denied, 407 U.S. 923, 92 S.Ct. 2471, 32 L.Ed.2d 809 (1972); United States ex rel. Scott v. Mancusi, 429 F.2d 104 (2d Cir. 1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1385, 28 L.Ed.2d 651 (1971). Although a claim frequently asserted is that the guilty plea was entered by the prisoner in the erroneous belief, induced by discussions with his lawyer, that he would receive a lesser sentence than that ultimately imposed or that he would be permitted to withdraw his guilty plea, this has repeatedly been held insufficient to warrant the issuance of a writ. E. g., United States ex rel. LaFay v. Fritz, supra; United States ex rel. Scott v. Mancusi, supra; United States ex rel. Callahan v. Follette, 418 F.2d 903 (2d Cir. 1969), cert. denied, 400 U.S. 840, 91 S.Ct. 80, 27 L.Ed.2d 74 (1970); United States ex rel. Bullock v. Warden, 408 F.2d 1326, 1330 (2d Cir. 1969), cert. denied, 396 U.S. 1043, 90 S.Ct. 688, 24 L.Ed.2d 686 (1970). We see no sound reason for not applying the same principle to petitions based on other types of subjective mistaken impression. To hold otherwise would be to provide every prisoner with an opportunity to start out with a guilty plea, with the assurance that if he should later be disappointed at the treatment accorded him he could withdraw his plea and demand a trial on the ground that at the time of his guilty plea he had labored under an erroneous impression as to what would happen to him after acceptance of the plea. See, e. g., United States v. Weese, 145 F.2d 135 (2d Cir. 1944). To justify the issuance of a federal writ vacating his guilty plea, the petitioner must bear the burden of showing that the circumstances as they existed at the time of the plea, judged by objective standards, reasonably justified his mistaken impression. Furthermore, as Mr. Justice White, speaking for the Supreme Court in McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763, stated (at p. 774, 90 S.Ct. at p. 1450):

"It is no denigration of the right to trial to hold that when the defendant waives his state court remedies and admits his guilt, he does so under the law then existing; further, he assumes the risk of ordinary error in either his or his attorney's assessment of the law and facts. Although he might have pleaded differently had later decided cases then been the law, he is bound by his plea and his conviction unless he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act."

The first ground asserted by Judge Lasker as the basis for his decision is that upon "the record so far developed, it cannot be said whether Curtis was competent either at the time of the pleading or at the time of the crime" and that it was therefore the duty of the state trial court to determine his competency before accepting his guilty plea. We disagree. The record discloses that on the basis of a two-month examination of him at Bellevue Hospital shortly prior to the court's acceptance of his guilty

plea two psychiatrists had found him mentally competent to understand the charge against him and to be capable of participating in the proceedings and making his defense. Furthermore, repeated psychiatric examinations of Curtis over a period of several years had fallen far short of diagnosing him as legally insane or of providing a likely basis for such a diagnosis. His counsel, with whom he cooperated fully, testified that he considered Curtis to be competent and capable of conducting intelligent discussion of various aspects of his case. The record of the hearing before Judge Lasker, where Curtis testified at length, reveals that he gave a coherent version of events that had occurred back in 1963, and comprehended the proceedings and the questions put to him.

Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836, 15 L.Ed.2d 815 (1966), which was heavily relied upon by the district court to support its decision that Curtis had not waived his right to a determination of his competence to stand trial, is clearly distinguishable. As we recently pointed out in United States ex rel. Roth v. Zelker, 455 F.2d 1105 (2d Cir. 1972) (Dkt. #71–1889), a decision similar in this respect to the present case, *Pate* turned on the failure of the trial court to order an inquiry into competence to stand trial after a great deal of evidence was introduced which raised substantial doubt as to competency. There was no such denial of due process in this case where the trial court acceded to defense counsel's request that a psychiatric examination be made to determine competency and the impartial court-appointed psy-

chiatrists found Curtis competent to stand trial.

With respect to the suggestion that Curtis might have been legally insane at the time of the crime, under New York law as it existed in 1963 insanity would constitute a legal defense only if a determination were made in accordance with the unmodified requirements of the M'Naghten Rule, which then prevailed in New York, that at the time of the crime he had such a mental defect as "1. Not to know the nature and quality of the act he was doing; or, 2. Not to know that the act was wrong".[9] Viewed in this light the record reveals no appreciable likelihood that a further examination of Curtis would provide an insanity defense. Although various institutions over the years had described Curtis in such terms as emotionally unstable, defectively delinquent, possessing anti-social tendencies, having behavioral disturbances, and as a sociopathic personality, none of them had ever suggested that he was psychotic, that he did not know right from wrong, or that he was legally insane. Less than two months prior to the murder of Langford, Curtis had been examined for two weeks by a psychiatrist who had found him merely to be sociopathic. The state was prepared to show at trial that he committed the murder in the course of an apparently pre-planned robbery and had thrown away his weapon immediately after the murder upon seeing a patrol car, circumstances indicating that he would be unable to meet the M'Naghten test. The Bellevue Report, based on a two-month psychiatric study immediately after the

9. Former Penal Law, McKinney's Consol. Laws, c. 40, § 1120 [1909], N.Y.Laws, ch. 88, § 1120 (repealed 1965). The statute was given a rigid construction by the New York courts at the time of Curtis' plea. See People v. Horton, 308 N.Y. 1, 123 N.E.2d 609 (1954); People v. Johnson, 13 Misc.2d 376, 169 N.Y.S.2d 217 (County Ct., Westchester County 1957). See also People v. Adams, 26 N.Y.2d 129, 309 N.Y.S.2d 145, 257 N.E.2d 610 (1970); J. Van Voorhis, Cardozo and the Judicial Process, 71 Yale L.J. 202, 209–10 (1961).

It should be noted that while proof of murder in the first degree, under New York law then in effect, normally required a showing of an intent to kill with deliberation and premeditation, in a felony-murder case proof of a killing in the course of a felony, without any design to effect death, was sufficient. Former Penal Law § 1044(2) [1909], N.Y.Laws, ch. 88, § 1044(2) (repealed 1965).

crime, found him to be without a legally cognizable mental defect.[10]

■ Under these circumstances a further judicial inquiry into Curtis' competency or sanity was not constitutionally required before acceptance of his guilty plea. Indeed, it is significant that under the federal system as it exists today no such requirements are imposed. If an issue of competency to stand trial arises in a federal criminal proceeding, the court appoints one psychiatrist to examine the accused, 18 U.S.C. § 4244 (1970). If that psychiatrist determines the accused to be competent, the district court is not required to hold a judicial hearing on the issue before accepting a guilty plea or commencing trial, e. g., United States v. Kaufman, 393 F.2d 172, 176 (7th Cir. 1968), cert. denied, 393 U.S. 1098, 89 S.Ct. 892, 21 L.Ed.2d 789 (1969) (trial); Kienlen v. United States, 379 F.2d 20, 29 (10th Cir. 1967) (plea); Cheely v. United States, 367 F.2d 547, 548–549 (5th Cir. 1966), cert. denied, 387 U.S. 923, 87 S.Ct. 2039, 18 L.Ed.2d 978 (1967) (trial). Nor need the sentencing judge in a federal proceeding, absent changed conditions brought to his attention, reopen the inquiry, e. g., Arnold v. United States, 432 F.2d 871 (10th Cir. 1970). It is the rule that "absent some unusual circumstance, where the question of mental competency has been determined in a Section 4244 proceeding prior to trial or prior to entry of plea of guilty, a Section 2255 [28 U.S.C. § 2255] collateral attack on the sentence based on the same ground will not ordinarily be permitted." Hanson v. United States, 406 F.2d 199, 202 (9th Cir. 1969). We do not believe that a state defendant seeking federal habeas corpus is entitled to more solicitude as a matter of constitutional due process than is a federal defendant for whom standards have been carefully established in the exercise of our supervisory power.

The principal reason given by the district court for granting the writ appears to be closely connected with the foregoing, namely that Curtis was "misled" by his counsel into believing that after pleading guilty he would be given still another psychiatric examination with the right, if that examination should result in a diagnosis of insanity at the time of the crime, to withdraw his guilty plea and to go to trial asserting insanity as a defense. The only evidentiary support offered for this finding is the following testimony given by Curtis (at the hearing before Judge Lasker) with respect to a conversation had with Feuer, his counsel, immediately before the entry of the guilty plea:

"Q. Was there anything further said in that conversation?

A. I asked the counsel about the psychiatrist that the court had appointed me and he said: Don't worry about it right now. Everything was all right.

Q. Did he indicate that that was to be forthcoming?

A. That's what I thought he meant. *I thought he meant that.*

\* \* \* \* \* \*

A. . . . He told me I would not do any more than 13 years and that was it. I accepted the word about the psychiatric report, about the examination and he said, don't worry about it." (Emphasis supplied).

■■ Viewing the foregoing testimony in the light most favorable to Curtis, it fails to reveal any statement by Feuer or by anyone else to the effect that if another psychiatric examination should result in a diagnosis of insanity Curtis would be permitted to withdraw his guilty plea and go to trial. The

---

10. Although the Bellevue psychiatrists were not specifically making a determination of Curtis' sanity, as we have recently indicated as to another habeas petitioner, it seems unlikely that they "would not have observed something indicating insanity at the time of the commission of the crime while they were examining him on his competence to stand trial." United States ex rel. Marcelin v. Mancusi, 462 F.2d 36, 44 (2d Cir. 1972).

most that can be said is that Curtis labored under an erroneous subjective impression that such would be the case. However, in the absence of substantial objective supporting evidence this does not provide a sufficient basis for the issuance of a writ. United States ex rel. LaFay v. Fritz, *supra*. Here, except for the vague statement attributed by him to his counsel, "Don't worry about it right now. Everything was all right", the evidence, far from supporting Curtis' impression, pointed in the opposite direction. According to Curtis' testimony his mother had induced him to plead guilty by directing his attention to the fact "that I didn't have a defense . . . and that I should plead guilty and *not try to go to trial as I had intended* . . . .", which indicates that he understood that he was required to choose between the alternative of pleading guilty or going to trial but that he could not have both. As we have noted he further testified that his counsel had advised him that "the court had destroyed my defense . . . and that he could not take me to trial with one psychiatrist . . . and that I had no defense [of insanity] and that I would be stupid to continue to go to trial without this". This statement strikes us as inconsistent with his claim of being under the impression that just such an examination by *one* psychiatrist, made after the entry of a guilty plea, might nevertheless enable him to interpose an insanity defense. Lastly we note that Curtis' earlier petitions for habeas relief make no claim that he was "misled" by his counsel. On the record as a whole we fail to find substantial evidentiary support for the district court's conclusion that Curtis was misled.

■ Turning to the alleged inadequacy of Curtis' counsel, we are governed by a stringent standard of longstanding to which we have uniformly adhered: conduct of counsel amounts to a constitutional denial of representation entitling a defendnat to release only where it has been proved to be "of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice", United States ex rel. Marcelin v. Mancusi, 462 F.2d 42 (2d Cir. 1972) (opinion of Judge Timbers quoting from United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950)); United States ex rel. Scott v. Mancusi, 429 F.2d 104, 109 (2d Cir. 1970), cert. denied, 402 U.S. 909, 91 S.Ct. 1385, 28 L.Ed.2d 651 (1971). As Judge Lasker stated, the conduct of Curtis' counsel while in his view falling below responsible professional standards, "may not have shocked the conscience as a constitutional matter". We hold that it did not.

It is surely true that Feuer or Masciarelli, dealing as they were with an emotional client would have been well advised to devote more time and thought to their duty to explain to him the legal significance of his decision to plead guilty. However, viewing the situation as it existed at the time of Curtis' guilty plea, there was every indication that if the case went to trial Curtis would probably be found guilty of first degree murder and that in view of the absence of any mitigating circumstances he might well be sentenced to death. After a series of psychiatric reports which had culminated in a finding of competency to stand trial by Bellevue psychiatrists, the chance that still another psychiatric examination might yield a diagnosis of insanity appeared to be exteremely slim. Although Feuer conceded, upon interrogation by the court, that he had "nothing to lose" in obtaining such an examination, he did face the risk that if it merely confirmed prior reports and resulted in a diagnosis that, according to the M'Naghten standard, Curtis was not insane at the time of the crime the District Attorney might then withdraw his offer to accept a plea to a lesser offense and insist upon going to trial. We fail to find under the *circumstances any* ineptitude of constitutional dimensions in Feuer's conduct.

■ One last point raised by the district court deserves mention, Judge

Lasker's suggestion that no intelligent waiver of constitutional rights was made by Curtis when he withdrew his not guilty plea and pleaded guilty to second degree murder, which appears to be based principally upon the failure of the record to reveal that he was advised of his rights and expressly waived them. Such a procedure, which is required by Rule 11, F.R.Cr.P., in federal proceedings, is preferred and indeed now mandated in state proceedings by *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). However, in 1963 a New York court in accepting a guilty plea was not required to follow specific procedures prescribed by *Boykin*, which this Court has held not to be retroactive, *United States ex rel. Rogers v. Adams*, 435 F.2d 1372 (2d Cir. 1970). Nor was the state court governed by Rule 11, F.R. Cr.P., which applies only to guilty pleas in federal court proceedings, see *McCarthy v. United States*, 394 U.S. 459, 89 S. Ct. 1166, 22 L.Ed.2d 418 (1969); *Halliday v. United States*, 394 U.S. 831, 89 S. Ct. 1498, 23 L.Ed.2d 16 (1969). Thus, at the time when Curtis' plea was accepted by the Bronx County Supreme Court no particular pattern or ritual was required of that court to satisfy itself that Curtis' guilty plea was voluntary and intelligently made.

The record here reveals that Curtis was no newcomer to the criminal courts. He had previously been convicted of burglary. Prior to changing his plea in the present case he was aware that he had a right to go to trial on the first degree murder charge. Indeed his mother had persuaded him "not . . . to go to trial as I had intended to" because he "didn't have a defense," and the central topic of his discussions with his lawyers was whether, if he should go to trial rather than plead guilty to the lesser offense, he stood a real chance of avoiding conviction for first degree murder. Finally he did advise the court, in response to questioning before the plea was taken, that the facts as stated in detail by the District Attorney were true and that he was not induced to plead guilty by any promises or threats. Under all of the circumstances we cannot say that his decision to plead guilty did not constitute a knowing waiver.

The decision of the district court is reversed.