**UNITED STATES of America ex rel. Fred Edwin JOHNSON, Petitioner,**

**v.**

**Hon. Vincent R. MANCUSI, Superintendent, Attica Correctional Facility, Respondent.**

**No. 71 Civ. 2426.**

United States District Court, S. D. New York.

June 10, 1975.

Eleanor Jackson Piel, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for respondent; Arlene Silverman, Asst. Atty. Gen., of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Petitioner Fred Edwin Johnson was sentenced to consecutive prison terms of one year and one-and-one/half to three years on June 22, 1966, following his plea of guilty on May 16, 1966 to two gambling-related, state criminal charges. He brought the present habeas corpus action while confined in New York State's Attica Correctional Facility, serving the second of those terms. Although subsequently released,[1] he has continued this suit, charging that his plea of guilty was involuntarily entered and should be set aside, and that he was denied effective assistance of counsel both when he changed his plea from not

---

1. Johnson completed serving the second prison term.

guilty to guilty, and also at sentencing when he sought to withdraw his guilty plea.

Johnson was indicted along with Frank Shepperson and Robert Royals, on one misdemeanor charge of conspiring to bribe public officers, operate a "policy" business, and assist in an illegal lottery, and on seven felony counts relating to their participation in the policy business or "numbers game". Shepperson and Royals retained Nathan Kestenbaum, Esq. to represent them. At Kestenbaum's suggestion, Johnson, who had discharged his first lawyer, retained Morris Levy, Esq. Levy, however, deferred almost entirely to Kestenbaum in this case.

On May 16, 1966, when the defendants and their lawyers were scheduled to appear before Judge Gellinoff of the New York Supreme Court, Kestenbaum and Levy met with Johnson at the "bullpen" at the courthouse. At that time, Johnson was serving a sixty-day sentence on unrelated state charges and had not seen Shepperson or Royals, or the two lawyers, for two or more weeks. Kestenbaum surprised Johnson by telling him that Shepperson and Royals had agreed to plead guilty, and he urged Johnson to do likewise. Kestenbaum told Johnson that the State had a very strong case [2] and would "waste" or "bury" him if he went to trial. Johnson also had a number of gambling convictions in his record,[3] which could have possibly been brought out if he testified. Moreover,

he apparently had no satisfactory explanation for some of the meetings charged.

What else Kestenbaum said has been the subject of substantial dispute. According to Kestenbaum's testimony,[4] he told Johnson that in his opinion Johnson would be sentenced to no more than several months if he pleaded guilty, as opposed to a possible eleven years if he stood trial and were convicted on all counts, as Kestenbaum thought likely. Kestenbaum testified that he told Johnson that he knew Judge Gellinoff; that he had had a dinner with the Judge during which they discussed the Judge's sentencing philosophy generally; that he thought the Judge was a mild person (recalling one or two cases where the Judge had imposed markedly mild sentences). Johnson, on the other hand, claims that Kestenbaum told him that he had a guarantee or promise from the Judge that Johnson would get only six months if he pleaded guilty.

Johnson resisted pleading guilty, protesting his innocence. The case was called and Kestenbaum secured a fifteen-minute adjournment in order to continue talking to Johnson. Johnson claims that he wanted to talk to Shepperson or Royals, but was unable to. Finally, he says, he agreed to plead guilty because of Kestenbaum's representation that the government would "waste" or "bury" him if he went to trial and because Kestenbaum allegedly

---

2. The state had a number of undercover agents who had allegedly observed the defendants conducting their gambling business over a period of months. It even had films of them collecting debts, signalling the winning numbers to people on the block, and the like. See Sentencing Transcript at 9–16.

3. These were apparently all misdemeanors, but they involved conduct similar to that with which Johnson was charged here. Indeed, it may have been the same conduct, with the state having made it a felony rather than a misdemeanor over the intervening years.

4. References to testimony by the various parties are to testimony given at the state

coram nobis hearing held before Judge Carney in 1967 and described below. Neither party has asked that this court hold a second evidentiary hearing, and to the extent that this court finds it necessary to make further factual findings, the parties have agreed that this can be done on the basis of that record. The testimony at that hearing was directed at the very issues now before this court; the transcript is 429 pages long; and certainly the witnesses' memories as to what occurred in May and June 1966 were much fresher at the hearing than they would be now, almost nine years after the events in question have occurred.

had a guarantee from the Judge of a six-month sentence.

The transcript from the hearing at which Judge Gellinoff accepted the defendants' guilty pleas that same day shows that Judge Gellinoff spelled out the charges to which the defendants were pleading, noting that one was a misdemeanor and one a felony. The defendants admitted having committed the acts charged and stated that they were pleading guilty voluntarily. Judge Gellinoff asked whether any promise had been made to them by anyone as to the sentence the court might impose, to which they replied "no". The defendants, prior to pleading guilty, were also advised that, under the law, a person charged with a felony may receive greater or different punishment if he has been previously convicted of another felony. Thus, if it were discovered that one of the defendants had been convicted of a prior felony,[5] this could affect his sentence. Sentencing was set for June 20, 1966. The Judge said that he wanted to sentence them soon, but that he wanted an "adequate time to make as good an investigation as I can—to do the best I can."

Johnson, having completed serving the sixty-day sentence, was released on June 17th, and saw Kestenbaum again for the first time at the courthouse on June 20th. Johnson has testified that he had been thinking about the alleged guarantee or assurance of the six-month sentence and really doubted that the Judge had made such a promise. He said that on June 20th "(I) continued to disagree with (Kestenbaum) as to his belief of the promise that I might be able to get the six months, and I wanted him to make an application to the court to withdraw my plea."[6] Kestenbaum testified that, as best as he could recall, the de-

fendants that day asked if everything had been arranged, to which he replied that there was no arrangement. He said "I kept repeating for quite sometime prior to this and on the day of sentence that I expected the sentence to be several months." Kestenbaum testified that Shepperson and Johnson responded that they had assumed they were assured of a sentence of only several months and said they wanted their pleas withdrawn.[7]

Johnson claims that he insisted that Kestenbaum move to withdraw his plea on the grounds that no one had come to him in jail prior to May 16th to tell him what he had pleaded to; that he had not understood what he was pleading guilty to; that now he understood that it was a misdemeanor and a felony; and that he felt he was innocent and wanted to withdraw his plea.[8]

Kestenbaum cautioned against this, and when called before the court on June 20th, he simply asked the court for a two-day extension. On June 22nd, when the court asked whether the defendants had any legal or other cause to show why judgment should not be pronounced against them, Kestenbaum moved on behalf of Johnson and Shepperson to withdraw their pleas. (Levy was not present at sentencing; Johnson consented to have Kestenbaum represent him.) Kestenbaum told the court that the defendants now thought that their pleas were "ill-advised" and that the state had insufficient evidence to convict them. The court, after detailing the interrogation it had conducted before accepting the defendants' pleas, denied the motion. After further argument by Kestenbaum (directed to sentencing) that defendants should not be penalized for their failure to cooperate with the police, and after the prosecutor sum-

5. As there was an agreement that defendants would be treated as first felony offenders, it appears that one or more of the defendants may have been previously convicted of a felony which the court was going to disregard. The reference to prior felonies here would refer to felonies not already disclosed to the court at the time the guilty pleas were offered and accepted.

6. Transcript from the coram nobis proceeding (hereinafter TR.) at 217.

7. TR. 386.

8. TR. 201.

marized the scope of defendants' activities and the strong evidence the state had against them, the court imposed sentence. The court never addressed Johnson personally prior to either the denial of the motion or the imposition of sentence. Johnson claimed on direct examination before Judge Carney that just before sentencing he tried to speak to the court and present all his reasons for wanting to withdraw his plea, but that a court officer put his hand over Johnson's mouth and told him to be silent. It is significant, however, that on cross-examination Johnson testified that this episode occurred just prior to his entering the plea of guilty.

The instant petition follows Johnson's unsuccessful direct appeal [9] and two coram nobis petitions, all joined in by Shepperson and Royals. In the initial coram nobis petition defendants stated in an affidavit that their pleas were involuntary because they had relied on Kestenbaum's ultimately incorrect estimate of what their sentences would be. They stated that they had expected to be sentenced to several months on the misdemeanor and to receive suspended sentences on the felony. In an affidavit supporting their petition, Kestenbaum (who did not represent them in this proceeding), stated that he had erred in his estimate of the sentence. Kestenbaum also charged that by imposing consecutive sentences the court was improperly trying to induce defendants to cooperate with the police in an effort against gambling and police corruption, in order to have their felony sentences suspended. Judge Gellinoff denied this petition without a hearing on May 18, 1967.

In the second coram nobis petition, brought in October 1967, the defendants alleged that they had been induced to plead guilty not by defense counsel's faulty estimate, but by his representation that the judge had promised a sentence of not more than six months.[10] Judge Gellinoff disqualified himself, ordered a hearing, and the case was transferred to Judge Carney. Judge Carney held a four-day hearing in late November and early December, 1967. At the hearing defendants were represented by counsel, Raymond A. Brown, Esq. Aaron Jaffe, Esq., the attorney who had drawn up the initial coram nobis petition, was also present. Johnson, Shepperson and Royals all testified, as did Raymond Shepperson (the defendant's brother), Kestenbaum and Judge Gellinoff. It was stipulated by both the state and the defendant that in fact there had been no promise made nor assurance given by Judge Gellinoff of a six-month sentence. Of his contact with Kestenbaum, Judge Gellinoff said they had met at a dinner party prior to the time this case was assigned to his calendar; that Kestenbaum had invited him to a cocktail party at his home that was held sometime after sentencing; and that he spoke to Kestenbaum once at the bench between the acceptance of the plea and the sentencing, at which time he asked directions to Kestenbaum's home. He said that he and Kestenbaum had spoken about the case only once, and that the prosecutor had been present at the meeting. All had agreed that defendants would be treated as first felony offenders. Judge Carney, in denying the petition in an opinion filed February 15, 1968, found that:

> "The defendants pleaded guilty, not because they were coerced into doing so, or did so involuntarily, but because Mr. Kestenbaum had convinced them that the People had a strong case and because they felt they could safely gamble on his alleged friendship with

---

9. Johnson's conviction and sentence were affirmed without opinion by the Appellate Division, First Department, on March 9, 1967.

10. The second coram nobis petition was brought following the dismissal, without prejudice, of a federal habeas corpus action making these new allegations, for failure to exhaust state remedies. (67 Civ. 3545, S. D.N.Y.) (Tyler, J.)

the judge and his estimate of a sentence of not exceeding six months which they assumed to be a promise. When they found out around sentencing time that the proposed sentence was not an actual promise of the Judge as they had assumed, but only an estimate by the lawyer, then they decided to withdraw their plea if possible.

"All three of these defendants are men in their adult years with criminal records. They knowingly entered their pleas of guilty after a full statement of the facts by the district attorney and a full and complete interrogation of each defendant by the court. Nothing that occurred during this proceeding cast doubt upon their guilt of the crimes to which they were pleading guilty. The pleading proceeding complied in all respects with the standards required in this state (*People v. Nixon,* 21 N.Y.2d 338 [287 N.Y.S.2d 659, 234 N.E.2d 687]).

"There is no claim here that Judge Gellinoff or the District Attorney made any promise to these defendants, that if they pleaded guilty, any particular sentence would be imposed. In fact it was stipulated that no such promises were made and Justice Gellinoff and Kestenbaum so testified. Consequently, if the defendants were induced to plead guilty by some misrepresentation or estimate of retained counsel, as to what their sentence would be, this would be no basis for the granting of a writ of error coram nobis. (*People v. Vance,* 7 A.D.2d 661 [179 N.Y.S.2d 148])."

With respect to the claim that defendants were denied effective assistance of counsel, Judge Carney denied the petition on the ground that both counsel (Kestenbaum and Levy) were experienced criminal lawyers, both were re-tained by defendants and not assigned by the court, and "there was nothing about their representation of these defendants that would have put [Judge Gellinoff] on notice that the attorney was not adequately and properly representing his client, if that be the fact." He found that the defendants' belated complaints provided no basis for coram nobis relief.

Only Johnson appealed that decision which was affirmed by the Appellate Division without opinion, on April 2, 1969. 32 A.D.2d 614, 300 N.Y.S.2d 278 (1st Dept.) Having exhausted his state remedies, Johnson, over two years later, filed the instant petition.[11]

In support of his claim that his plea was involuntary, Johnson argues that the state court applied an incorrect legal standard. Judge Carney, as quoted above, stated that even if Johnson had been induced to plead guilty by some misrepresentation by defense counsel as to what the sentence would be, such a misrepresentation would provide no basis for setting aside the guilty plea.

██ Cases in this circuit have held that where a defendant's expectation of leniency is induced by an *erroneous estimate made by defense counsel,* a guilty plea will still be found to have been made voluntarily. E. g., *United States ex rel. LaFay v. Fritz,* 455 F.2d 297 (2d Cir. 1972), *cert denied,* 407 U.S. 923, 92 S.Ct. 2471, 32 L.Ed.2d 809 (1972). Similarly, where a defendant pleads guilty under the *subjective* mistaken impression that a promise of a lenient sentence has been made by a judge or prosecutor, the plea will be found voluntary. See e. g., *United States ex rel. Curtis v. Zelker,* 466 F.2d 1092, 1098 (2d Cir. 1972), *cert. denied,* 410 U.S. 945, 93 S.Ct. 1405, 35 L.Ed.2d 612 (1973). However, where a defendant proves that the circumstances as they existed at the time of the guilty

11. The present petition was filed on May 28, 1971. On February 2, 1972, Judge Motley denied the appointment of counsel and ordered Johnson to submit a reply to the state's answering papers. The case was transferred to my calendar in late 1972 following my appointment to the bench. Upon a reconsideration of Johnson's petition, counsel was appointed to represent him. Argument was heard on January 24, 1975.

plea, *judged by objective standards*, reasonably justified his mistaken impression that a promise of leniency had been made, a guilty plea will be set aside as involuntary (see *Mosher v. LaVallee*, 491 F.2d 1346, 1348 (2d Cir.), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974); *United States ex rel. Oliver v. Vincent*, 498 F.2d 340, 341 n. 1 (2d Cir. 1974)) just as it would be if there were in fact an unfulfilled promise of a lenient sentence made by a judge or prosecutor (*Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)). In both *Mosher* and *Oliver* courts relied upon misrepresentations by defense counsel, believed by the defendants, that a promise of leniency had been made, as the basis for finding that the guilty pleas had been involuntarily entered.

■■ Johnson argues that this case falls within *Mosher* and *Oliver*. However, Judge Carney found that Kestenbaum had made an estimate of the sentence Johnson and his co-defendants would receive, which estimate they only assumed to be a promise. Judge Carney's factual findings, reached after a full hearing, must be presumed correct, unless Johnson can prove by convincing evidence that they are erroneous. 28 U.S.C. § 2254(d). In this case there is an ample basis for Judge Carney's conclusion that Kestenbaum gave only his estimate of what the sentence could be. Judge Carney viewed the demeanor of the witnesses and chose to credit Kestenbaum's testimony. Corroborating Kestenbaum's testimony was the fact that the defendants, in their initial coram nobis proceeding (where they were no longer represented by Kestenbaum), asserted only that Kestenbaum's estimate or opinion of the sentences they would receive had been erroneous. In addition, there is the fact that the defendants told Judge Gellinoff, at the time they pleaded guilty, that no promises had been made. This latter factor is not determinative

in all cases.[12] However, in these circumstances, the finding of the state court that Kestenbaum gave only his estimate of what the sentences would be must stand.

Johnson argues, however, that there was a reasonable basis to support his interpretation of Kestenbaum's remarks as indicating that a promise of leniency had been made by the judge. In particular, he argues that he was pressured into pleading guilty that one morning at the courthouse and that Kestenbaum said he had had dinner with the judge and knew him personally. However, even if these factors were believed, they are not enough to bring Johnson within the rule of *Mosher* and *Oliver*. It should be noted that Judge Carney described the defendants as merely "assuming" that Kestenbaum's estimate was a promise, suggesting that he felt there was not a substantial basis to justify defendants' mistaken belief of a promise of leniency. Moreover, in contrast to *Oliver* and *Mosher*, there was no affirmative misrepresentation by the lawyer. In fact, there is reason to believe from Johnson's own testimony that at the time of the plea, Johnson himself doubted that a promise had been made, even though in pleading guilty he allegedly relied upon the representation that such a promise had been made.[13] Furthermore, Kestenbaum's alleged friendship or familiarity with the judge would have been a factor to which Kestenbaum might refer in order to lend credence to his ability to estimate the sentence the judge might impose. Although such references carry the danger of misinterpretation, it is not at all clear that anyone would be justified in interpreting them as Johnson claims he did.

I find, upon a review of the record and in light of Judge Carney's findings after a full hearing, that Johnson has not met his burden of proving that the circumstances reasonably justified his alleged mistaken impression that a

---

12. See, e. g., *United States ex rel. Oliver v. Vincent*, 498 F.2d at 342 n. 1.

13. TR. 219, 271.

promise of leniency had been made by the judge.

■ Johnson's second claim is that he was denied effective assistance of counsel. The burden Johnson must carry here is a heavy one. Counsel's conduct must have been such as would "shock the conscience of the court" or make the proceedings a mockery of justice and it must have deprived defendant of substantial rights. See *United States ex rel. Marcelin v. Mancusi*, 462 F.2d 36, 42–43 (2d Cir. 1972), *cert. denied*, 410 U.S. 917, 93 S.Ct. 977, 35 L.Ed.2d 279 (1973). In the *Mosher* case, this burden was sustained by petitioner, where the attorney's flat misrepresentation that there was a promise from the judge was found so shocking as to have deprived petitioner of substantial constitutional rights. It has not been sustained here.

■■ It should be noted that Levy and Kestenbaum may not have done all they might to eliminate the possibility of even a subjective mistaken impression by Johnson and the other defendants that a promise of leniency had been made by the judge. Counsel should make it clear that an estimate is only that, and that a judge might impose a different sentence, even at the risk of deterring a defendant from entering a plea which his counsel believes to be in his best interest. However, counsel's failure to emphasize that six months was only his estimate is significantly different from counsel's affirmative misrepresentations in *Mosher* that a promise of leniency had been made. Moreover, even Johnson admits that prior to sentencing he was aware that no promise had been made, yet, as discussed below, he made no significant effort to have his alleged mistaken belief that a promise had been made called to the attention of the court.

■ With respect to the sentencing hearing, Kestenbaum admitted to Judge Carney that he had not fully stated what he perceived to be defendants' reasons for moving to withdraw their guilty pleas.

THE COURT: So that, when you came up for sentence and they asked you to make an application to withdraw their plea, you in your own mind knew that they had the thought in their mind that you were guaranteeing that they were going to get a certain sentence based on a promise from the judge.

THE WITNESS (KESTENBAUM): That's right.

Q (THE STATE): Why didn't you make that application in those terms, Mr. Kestenbaum?

* * * [Objections overruled]

A: Well, this was in June of 1966, Mr. McGuire. As I understood the law with respect to—

* * * [Objections overruled]

A. I didn't think that was material to the matter of withdrawal of a plea.

THE COURT: Why not? In other words, if it was a fact that these people agreed to plead guilty on the false assumption, as you claim, that you had a promise from the judge that they would get a certain sentence, why wasn't that important? That showed the reason they wanted to withdraw the plea, didn't it?

THE WITNESS: Except that my understanding of the law was, Your Honor, that where the court makes a promise and doesn't keep it, that entitles the defendants; but where there has been a lack of communication between attorney and client, it was my impression of the law as it existed then that that was no basis for the withdrawal of a plea.

THE COURT: Technically, no; but there might be something the judge might be interested in hearing.

THE WITNESS: Yes."

Assuming, as Judge Carney found, that Kestenbaum had only given Johnson his estimate of the sentence imposed, Kestenbaum's interpretation of whether Johnson was entitled to withdraw his plea was understandable. On the other

hand, the judge certainly had the power to grant the motion in these circumstances. The state had suffered no prejudice—the case probably would not otherwise have come to trial by that time and no evidence would have been lost. In addition, Johnson had not waited until receiving a sentence greater than he expected before moving to withdraw his plea.

Johnson claims that Kestenbaum's failure to state fully the reasons Johnson wanted to withdraw his plea was especially prejudicial because he did not have an opportunity to address the court himself prior to the court's denial of the motion or the imposition of sentence. Although this situation would not arise again in New York today, as the courts are required to ask each defendant if he wishes to make a statement prior to the imposition of sentence, N.Y.Crim.Proc. Law § 380.50 (McKinney 1971), prior state law (N.Y.Code Crim.Proc. § 480, amended Sept. 1, 1971) required the court only to make a general inquiry of the defendants and their counsel, as it did here.[14] Here, only Kestenbaum spoke on behalf of the defendants. Neither Shepperson, Royals, nor Johnson said anything on their own behalf.

With regard to whether Johnson tried to speak up, however, there is nothing in the transcript from the sentencing hearing to indicate that there was a disturbance of any kind or that Johnson tried to say anything. In fact, as noted above, Johnson's testimony as to the occasion of his attempt to address the court was inconsistent. Moreover, Kestenbaum testified that he did not recall such an incident, although as Johnson was standing off to his side, he indicated that he might not have noticed it unless it was called to his attention.

On the basis of the record, I conclude that Johnson, if he made any effort to speak up, certainly did not make much of an effort. It would clearly not have required much before the judge, or the court reporter in the minutes, would at least have taken notice that something was happening involving the defendant. Instead, Johnson chose to remain silent as the prosecutor, the judge, and Kestenbaum discussed the scope of defendants' criminal activities, the strong evidence against them, and the fact that they should not be "punished" for their refusal to cooperate with the police (on fear of their lives) in its efforts to crack a citywide gambling ring.

Although Johnson now complains that Kestenbaum did not make all the arguments he should have at sentencing, the fact that Johnson made no significant effort to speak up, if indeed he made any effort at all, seems to me to undercut any claim he has that he was substantially prejudiced as a result of Kestenbaum's conduct. In these circumstances, I do not believe that Johnson was unconstitutionally denied effective assistance of counsel at sentencing, or through the entire process including the entry of the guilty plea.

The assistance to the Court of Eleanor Jackson Piel, Esq., who undertook to represent this petitioner after the petition had been filed and who did a thoroughly professional work in so representing the petitioner, is noted and deeply appreciated.

Petition dismissed.

So ordered.

---

14. Sentencing Transcript at 2. After denial of the motion to withdraw the guilty plea, the court inquired whether Shepperson had anything further to say. Kestenbaum spoke up and addressed the court with respect not only to Shepperson, but to Johnson and Royals as well. None of the defendants spoke on their own behalf.